GOLDEN HILL PAUGUSSETT TRIBE OF INDIANS *v.*
LOWELL P. WEICKER, JR.
(AC 17460)

Landau, Spear and Freedman, Js.

Argued September 23, 1998—officially released January 26, 1999

*Julia B. Morris*, with whom, on the brief, were *Michael D. O'Connell* and *Matthew W. Den Ouden*, for the appellant (plaintiff).

*Daniel R. Schaefer*, assistant attorney general, with whom, on the brief, were *Richard Blumenthal*, attorney general, and *Carolyn K. Querijero*, assistant attorney general, for the appellee (defendant).

*Opinion*

FREEDMAN, J. This is an appeal from the judgment of the trial court denying the plaintiff's request for a writ of mandamus to compel the defendant to commence negotiations with the plaintiff pursuant to General Statutes § 47-66h (a).[1] We affirm the judgment of the trial court.

---

[1] General Statutes § 47-66h (a) provides: "Effective October 1, 1990, the Governor shall enter into a trust agreement with each willing indigenous Indian tribe. Any such trust agreement shall define the powers and duties possessed by the tribe that is party to the agreement and shall be consistent with recommendations on trust agreements contained in the final report of the Indian Affairs Task Force made pursuant to special act 87-103."

The following facts are relevant to this appeal. The plaintiff brought this mandamus action alleging that, pursuant to General Statutes § 47-66h (a), the defendant[2] is required to enter into a trust agreement with each willing indigenous Indian tribe. The plaintiff alleged that in March, 1991, it informed the defendant of its willingness to enter into a trust agreement pursuant to § 47-66h (a). The plaintiff further alleged that at all times since March, 1991, the defendant has refused to enter into a trust agreement or to institute a process of dialogue and negotiation leading to a trust agreement. The plaintiff claimed that it was therefore deprived of a clear legal right, and sought a writ of mandamus ordering the defendant "to begin negotiation of a trust agreement with the plaintiff [Golden Hill Paugussett Tribe of Indians] as mandated by § 47-66h."

The defendant filed an answer and three special defenses. The trial court, in denying the request for mandamus, considered only the third special defense, that is, that the Indian Affairs Task Force (task force) failed to issue a final report containing trust agreement recommendations, a condition precedent to the defendant's entering into a trust agreement according to § 47-66h.[3] The trial court rendered judgment for the defendant concluding, in light of the statute, its legislative history and other extrinsic evidence, that (1) the 1991 report of the task force was the final report, (2) this final report did not contain any recommendations as to trust agreements as required by § 47-66h and (3) a writ of mandamus could not issue in the absence of

[2] The complaint originally named Governor Lowell P. Weicker, Jr., as the defendant. The plaintiff filed its second amended complaint on May 31, 1996, naming Governor John G. Rowland as the defendant.

[3] The defendant also asserted as special defenses that (1) § 47-66h is unconstitutional and (2) § 47-66h violates the principle of separation of powers and improperly interferes with the executive branch.

trust agreement recommendations in the final report. It is from that judgment that the plaintiff appeals.

Before turning to the specific issues involved, it is important to note that "[a] party seeking a writ of mandamus must establish: (1) that the plaintiff has a clear legal right to the performance of a duty by the defendant; (2) that the defendant has no discretion with respect to performance of that duty; and (3) that the plaintiff has no adequate remedy at law. . . . Even satisfaction of this demanding test does not, however, automatically compel issuance of the requested writ of mandamus. . . . In deciding the propriety of a writ of mandamus, the trial court exercises discretion rooted in the principles of equity." (Citations omitted; internal quotation marks omitted.) *Hennessey* v. *Bridgeport*, 213 Conn. 656, 659, 569 A.2d 1122 (1990).

"Even [if] the plaintiff has a legal right to the matter sought, the writ will not issue if that right be nothing more than a naked right. In addition to a bare legal right, he must have a proper interest in, and a proper purpose to be served by, the doing of the act sought to be ordered. . . . If the right sought to be enforced is or has become a mere abstract right, the enforcement of which will be of no substantial or practical benefit to the petitioner, the writ will not issue though otherwise the applicant would be entitled to it." (Internal quotation marks omitted.) *Sotire* v. *Stamford*, 19 Conn. App. 505, 514, 563 A.2d 1021, cert. denied, 213 Conn. 805, 567 A.2d 835 (1989).

Section 47-66h (a) provides that the governor shall enter into a trust agreement with each willing indigenous Indian tribe, and that any such trust agreement *"shall be consistent with recommendations on trust agreements contained in the final report of the Indian Affairs Task Force made pursuant to special act 87-103."* (Emphasis added.) It is important to understand

the history of this statute and the task force prior to analyzing the claim of the plaintiff.

In 1987, the task force was established "to review existing statutes, budgets, agencies and programs affecting Connecticut Indians." Special Acts 1987, No. 87-103. The task force was given a nonexclusive list of topics for study and recommendation, and was directed to submit a report to the governor and General Assembly on or before January 1, 1989.

In 1989, the task force submitted its first report to the General Assembly. The report recommended, in part, that "the Governor shall pursue a trust agreement with each willing indigenous Tribe; such trust agreement shall define the special nature of the state's relationship with each particular tribe." The report also recommended an extension of the task force's authorization for an additional thirteen months, until February 1, 1990, for further study of several topics including "[f]urther description and review of trust agreements." By Public Acts 1989, No. 89-368, § 28, the legislature amended Special Acts 1987, No. 87-103, by extending the period for the report of the task force until February 1, 1990. It also added "description and review of trust agreements" to the list of topics for the task force to consider. Section 17 of Public Acts 1989, No. 89-368, was the genesis of § 47-66h,[4] presently at issue.

In 1990, the task force submitted its second report to the General Assembly. In the section entitled "Recommendations, 1990," the task force suggested, "[t]hat the language of 17 (a) requiring tribal-state trust

---

[4] Public Acts 1989, No. 89-368, § 17 (a) provides: "Effective October 1, 1990, the governor shall enter into a trust agreement with each willing indigenous Indian tribe. Any such trust agreement shall define the powers and duties possessed by the tribe that is party to the agreement and shall be consistent with recommendations on trust agreements contained in the final report of the Indian Affairs Task Force made pursuant to special act 87-103, as amended by section 28 of this act."

agreements to be consistent with recommendations developed by the Indian Affairs Task Force be deleted as a potentially unconstitutional delegation of power and an interference with state and tribal sovereignty." Under the section entitled "Discussion of Issues," a subsection entitled "What is a trust agreement?" includes a "partial list of matters which might be negotiated in trust agreements."[5] In another subsection entitled "Fiscal Impact of Trust Agreements," the task force concluded that because only the Golden Hill Paugussett Tribe had expressed readiness to enter into a trust agreement, the part-time efforts of one representative of the state would be fully adequate to negotiate such agreements. The 1990 report concluded by requesting another extension of the task force to consider outstanding issues. In this section of the report, the task force noted that "useful insights may be gained through review of the initial steps of the trust agreement process and that these might be incorporated in future legislation."

By Special Acts 1990, No. 90-25, the legislature extended the reporting period of the task force until February 1, 1991. Special Acts 1990, No. 90-25, did not change the requirement that trust agreements be consistent with any trust agreement recommendations contained in the final report of the task force. The act specifically provided that "review and analysis of the trust agreement process" be one of the items for the task force to study and make recommendations. In 1991, the task force issued its final report, which did not include any trust agreement recommendations.[6]

---

[5] See footnote 7.

[6] The final report states: "The Task Force concluded that Public Act 89-368 has important implications and far-reaching legislative concerns with respect to the relationship between the State of Connecticut and its indigenous Native American Tribes. The Task Force also concluded that more time is needed to fully assess the short and long term effectiveness of P.A. 89-368. At this time the Task Force on Indian Affairs has decided not to

I

We first consider whether the trial court properly concluded that the 1991 report constituted the final report of the task force, and that this final report did not contain trust agreement recommendations as required by § 47-66h. The plaintiff contends that the legislative intent would best be served by finding that the necessary recommendations were contained in the 1989 report and were supplemented in the 1990 report and that, therefore, the 1990 report constituted the "final report" on the issue.

In support of its argument, the plaintiff notes that the legislature allowed for serial reporting by the task force. Specifically, although Special Acts 1987, No. 87-103, provided that the task force was to submit its report to the governor and General Assembly on or before January 1, 1989, the act further stated that "[t]he task force may report recommendations, in whole or in part, at any time prior to said date." This language is reiterated in § 28 (c) of Public Acts,1989, No. 89-368, which extended the reporting period of the task force until February 1, 1990, and subsection (c) of Special Acts 1990, No. 90-25, which extended the reporting period until February 1, 1991. We disagree with the plaintiff, however, and conclude that the statutory language, the legislative history and the factual record support the trial court's conclusion that the final report for purposes of § 47-66h was the report issued in 1991.

As previously noted, § 47-66h provides that a trust agreement "shall be consistent with recommendations . . . contained in the *final report*" of the task force.

initiate any new remedial legislation. The final recommendation of the Task Force was to request that the Program Review Committee undertake a review of the Connecticut Indian Affairs Council."

(Emphasis added.) The task force issued three reports, in 1989, 1990 and 1991. The first report, in 1989, recommended that the governor enter into a trust agreement with each willing indigenous tribe. It also requested an extension until February 1, 1990, for the study of several topics including "further description and review of trust agreements." The 1990 report contained a section about trust agreements, including a "partial list of subjects which might be negotiated in trust agreements."[7] It did not, however, contain any specific recommendations regarding trust agreements as required by § 47-66h.

---

[7] The section of the 1990 report entitled "What is a trust agreement?" states: "Under P.A. 89-368 § 17 (a) and Raised Bill No. 6000 § 8 (a) & (c), the Task Force on Indian Affairs has provided that each indigenous Indian tribe may enter into a trust agreement with the state which shall define 'the mutual obligations of the tribe and the state of Connecticut in relation to each other.'

"These trust agreements may involve the whole range of governmental duties and actions and will cover subjects that are of particular concern to the tribes and the state or its subdivisions. A partial list of matters which might be negotiated in trust agreements would include: 1) services the state will provide to the tribe, e.g., maintenance of roads, provision of signs or boundary fences, surveying, expert advice on forestry, environmental protection, sanitation or building codes, stocking of fish, or provision of fish and game officers; 2) tribal duties in return for services, e.g., following state regulations on lumbering, protection of wetlands, or bag and season limits on hunting and fishing or developing its own regulations in cooperation with state agencies; 3) provisions for law enforcement on the reservation of major crimes and those committed by non Indians, by state police or municipal police or, someday, in cooperation with tribal deputies; 4) the applicability or not of state taxes to transactions involving the reservation; 5) the possible provision by the state of assistance in developing tribal governmental structures and codes or in planning for tribal economic development; and 6) the funding of such services the state may undertake to provide.

"The trust agreement provision is designed to create a method for sorting out the present confusion on the part of the state and the tribes regarding what governmental actions are allowable by each or are required by each in a way that will be sensitive to the individual circumstances and needs of each tribe. It is hoped that trust agreements can fill the gaps existing in the absence of federal involvement with Connecticut tribes and that the state and tribal governments can use these negotiated agreements to meet the needs and concerns of both."

The 1990 report requested that the task force be extended again, noting that it believed that "useful insights may be gained through review of the initial steps of the trust agreement process and that these might be incorporated in future legislation." This language supports the inference that the task force did not view its work as complete with regard to trust agreements. Special Acts 1990, No. 90-25, again extended the life of the task force until February 1, 1991. Pursuant to this act, among the topics that the task force was to continue to study was the "review and analysis of the trust agreement process." As the trial court noted, this language supports the inference that the work of the task force was not yet complete as far as trust agreements were concerned. The legislative history of Special Acts 1990, No. 90-25, further supports this conclusion. Specifically, the Senate proceedings reflect that in addition to extending the life of the task force, one of the purposes of the act was to enable the task force to continue to study certain issues, including trust agreements.[8]

The plaintiff claims that the trial court improperly relied on evidence outside of the legislative record in support of its conclusion that the final report was the 1991 report. Specifically, the trial court relied on a series of internal task force documents from the summer and fall of 1991 that discuss the continuing need for a final report. Further, in a July 20, 1990 memorandum from Senior Attorney David Keith Leff of the office of legislative research to Representative John W. Thompson,

---

[8] Senator Steven Spellman stated: "Basically, this bill does two things. . . . It extends the life of the Task Force on Indian Affairs in regard to their reporting date from February 1, 1990 to February 1, 1991, and it *increases their areas of concern to address* tribal funds, Indians who are not indigenous tribes in Connecticut, the issue of sovereignty, *review and analysis of the trust agreement process* and also the definition of 'care and management of reservation lands.'" (Emphasis added.) 33 S. Proc., Pt. 10, 1990 Sess., p. 3270, remarks of Senator Steven Spellman.

chairman of the task force, responding to the question of when trust agreements may be negotiated, Leff concluded that there was no final report.[9] The trial court also relied on the plaintiff's responses to interrogatories, in which the plaintiff stated that the final report of the task force was not submitted to the governor and General Assembly until November 21, 1991. The plaintiff does not claim that these materials were irrelevant, only that it was not necessary for the court to consider them. The plaintiff cites no authority in support of this proposition and we conclude that the court properly considered these items in arriving at its decision.

The trial court correctly determined that the final report of the task force was the 1991 report, and that this report did not contain any trust agreement recommendations. Even if we were to agree that all of the reports collectively constitute the final report, our conclusion that the task force failed to issue a final report containing trust agreement recommendations would remain unchanged. In so ruling, we disagree with the plaintiff that the trial court should have given greater weight to a letter dated February 22, 1991, from Representative Thompson to Governor Weicker.[10] This letter

---

[9] The memorandum states: "The law requires that these [trust] agreements define the powers and duties possessed by the tribe and be consistent with recommendations on trust agreements contained in the final report of the Indian Affairs Task Force. Although the 1990 task force report discussed in general what might be included in a trust agreement, there have been no official recommendations on the subject (Legislative Task Force on Indian Affairs, Report to General Assembly, 2/90, at 11 and 12). Furthermore, with the extension of the task force until February 1, 1991, including a mandate to review and analyze the trust agreement process, there is no final report."

[10] The letter states: "I am pleased to inform you that the Indian Affairs Task Force completed its duties on the evening of January 31, 1991. A small subcommittee of the Task Force has been delegated to draft a brief report for your consideration.

"The task force believes that Public Act 89-368 was important and far-reaching legislation concerned with relationships between the State of Connecticut and its indigenous Native American tribes. As a consequence, all

indicated, in part, that a final report would be forthcoming. It specifically stated that the task force had not changed its previous recommendations, and therefore did not see a need to restate them. The trial court provided several reasons why it deemed this letter insufficient to prove that "final" as used in § 47-66h denotes "decisive" or "conclusive" as the plaintiff had argued.[11] The trial court's ruling in this regard is fully supported by the other evidence that it considered.

## II

Having concluded that the task force did not issue recommendations regarding trust agreements in its final report, we next consider whether the trial court properly denied the plaintiff's request for a writ of mandamus.

As previously noted, a writ of mandamus will not issue for the enforcement of a naked or abstract right. See *Sotire* v. *Stamford*, supra, 19 Conn. App. 514. According to § 47-66h, any trust agreement entered into between the governor and a willing indigenous Indian tribe shall be consistent with recommendations of the task force regarding trust agreements. Because the task

issues that were referred to us were discussed, but at this time the Task Force has decided not to initiate any new or remedial legislation. Instead, the Task Force will recommend to the Program Review Committee that it undertake a review of the Connecticut Indian Affairs Council. The task force has not changed its previous recommendations on the other matters referred to us, and therefore did not see a need to restate them. Those recommendations will need further deliberation by committees of cognizance in the General Assembly."

[11] The reasons stated by the trial court were: "(1) [The letter] relies on Representative Thompson's belief that the task force can incorporate the recommendations as to trust agreements contained in the 1990 report into the 1991 report, yet there is no statutory basis for this belief; (2) the letter states the opinion of Representative Thompson alone without any indicia that the letter or its contents were adopted by the entire task force . . . and (3) the actual 1991 report does *not* state that it incorporates by reference the recommendations of the 1990 report, despite the sentiment shared by Representative Thompson in [the letter]." (Emphasis in original.)

force did not issue a final report containing trust agreement recommendations, the plaintiff possesses a mere naked or abstract right. As such, the trial court properly concluded that the writ of mandamus could not lie because the enforcement of the right to have the defendant enter into negotiations would be of no substantial or practical benefit to the plaintiff.[12] Id.

The judgment is affirmed.

In this opinion the other judges concurred.

---

[12] Because we conclude that the writ would not lie in any event as it seeks the enforcement of a naked or abstract right, it is unnecessary to consider the plaintiff's argument that recommendations of the task force are not a condition precedent to the defendant's entering into a trust agreement.